UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| RAYMOND F. DANIELS, III, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL NO. 1:09cv121 |
| | ) |
| MICHIANA METRONET, INC. d/b/a | ) |
| CENTENNIAL WIRELESS and | ) |
| CENTENNIAL COMMUNICATIONS, | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant Michiana Metronet, Inc. d/b/a Centennial Wireless and Centennial Communications ("Centennial"), on February 1, 2010. The plaintiff, Raymond F. Daniels, III ("Daniels"), filed his response on March 1, 2010, to which Centennial replied on March 17, 2010.

For the following reasons, the motion will be granted.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  Id.  In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986).  No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323.  The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment.  Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of

Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Id. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." Anderson, 477 U.S. at 251-252. Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

Centennial claims that the following background facts are undisputed. During the time period relevant to his Complaint, Daniels applied for employment with Centennial because it was a local business and he had heard from friends that it was a fair company and a good place to work.[1] Before he had even received a formal offer, one of those friends, Michael Loveless, explained to Daniels that he would receive base pay plus commission and that he would be paid "halftime" for overtime work.[2] Daniels and Loveless worked together previously at Chase Bank.[3] At the time of this discussion, Loveless managed Centennial's Decatur store.[4] Loveless explained that Daniels' starting base pay would be $18,000 annually and that it would increase incrementally thereafter.[5] Loveless told Daniels he might be called upon to work mandatory overtime during the holiday season and that it was company policy to pay "halftime" not time and a half for overtime work.[6] Loveless suggested Daniels look for further explanation of

---

[1] Daniels Dep., pp. 6-11, 14, 19, 23.

[2] Daniels Dep., pp. 19, 34-38.

[3] Daniels Dep., p. 31.

[4] Daniels Dep., p. 32.

[5] Daniels Dep., p. 36-37.

[6] Daniels Dep., p. 38.

4

Centennial's pay structure during his formal training course.[7] Daniels did not seek further clarification.[8]

By letter dated May 20, 2008, Centennial formally offered Daniels the position of Inside Sales Representative Trainee Level I.[9] The offer letter spelled out the basic pay structure, stating in relevant part:

> **Training Requirements:** New hires begin employment by attending three weeks of Sales Training at Centennial University in Fort Wayne, IN. . . . .
>
> ******************************************************************
>
> **Employment at Will:** As a condition of employment, you will be asked to sign and read our Associate Handbook, which explains "at will" employment, and to sign the Sales Compensation Plan, which describes how you will be paid, includes a non-disclosure agreement and confidentiality agreement.
>
> **Compensation:** You will receive a salary of $692.30 per pay period, which annualizes to $18,000. You are paid 26 times per year on a bi-weekly basis. In addition you will be paid a monthly commission, which is based on achieving the monthly quota.

The offer letter goes on to explain the details of and prerequisites for future, incremental salary increases.[10] Daniels read and accepted the offer by signing the letter on May 22, 2008.[11]

Daniels began employment with Centennial on June 2, 2008.[12] He worked as a "shadow"

---

[7] Daniels Dep., p. 39.

[8] Daniels Dep., p. 39.

[9] Daniels Dep., p. 33, Ex. 2.2.

[10] Daniels Dep. Ex. 2.

[11] Daniels Dep., pp. 33, 44.

[12] Daniels Dep., p. 45.

his first week then attended three weeks of training.[13] Training Manager Mike Filson led Daniels' training class.[14] Filson told the class they would be paid "halftime" for overtime work.[15] The Centennial Associate Handbook, which was given to Daniels in hardcopy and formed the basis of his understanding of how he was paid, states: "Certain nonexempt positions (i.e. inside sales representatives) are paid overtime on a sliding scale."[16] Daniels understood the "sliding scale" reference to mean he was paid "halftime" for overtime work.[17] The Associate Handbook further directs employees to consult their "compensation agreement or manager for more details."[18]

Centennial's Sales Compensation Plan was electronically presented to Daniels and the others in his training class.[19] Employees are given as much time as is necessary to read the document and ask any questions they might have, and then they must acknowledge having read and understood the plan.[20] Had Daniels not acknowledged having read and understood the plan, Centennial's commission department would not have issued him any commission checks.[21]

---

[13] Daniels Dep., p. 47- 48; Filson Dep., p. 9.

[14] Filson Dep., p. 4.

[15] Daniels Dep., p. 50.

[16] Daniels Dep., p. 51, 58-59; Ex. 4, p. 18.

[17] Daniels Dep., p. 59.

[18] Daniels Dep., p. 60, Ex. 4, p. 18.

[19] Filson Dep., p. 7; Daniels Dep., p. 74-79, Ex. 5.

[20] Filson Dep., p. 8-10.

[21] Filson Dep., p. 10-11.]

Daniels did in fact receive commission checks from Centennial.[22]

The Centennial Wireless Sales Compensation Plan states in relevant part:

Inside Sales Rep Overtime Program

Our Inside Sales Reps are salaried, non-exempt associates. This means two things. First, an ISR receives a full weekly salary regardless of the number of hours worked. For example, if an ISR missed two hours of scheduled work time due to an auto accident, the rep's salary is not reduced by the two missed hours. We believe this is the professional way to treat our Inside Sales Reps.

Second, the amount paid for any overtime is based on a calculated amount,
not one and one-half times as an hourly associate would be paid. This is also the professional way to treat salaried, non-exempt associates.

The following are the guidelines for calculating ISR overtime pay.

1) A workweek is defined as Sunday at 12:00 am through Saturday at 11:59 pm.

2) ISR overtime is calculated based on workweek.

3) An ISR's annual salary is divided into 52 weeks to obtain a weekly salary, ($24,000 divided by 52 is $461.54)

4) The weekly salary is divided by the number of actual, total hours worked during the workweek to calculate the individual ISR's hourly rate.

5) The amount paid for overtime hours is one-half the calculated hourly rate.

6) The number of hours worked over forty (40) during the workweek is multiplied by the calculated hourly rate to determine the total amount paid.

The following example shows how to calculate the overtime paid to an ISR.

---

[22] Defendant's Ex. 14, p. 115, 118, 121, 124, 128.

- Fifty (50) hours worked during the workweek.
- Weekly salary is $451.54 ($24,000 divided by 52 weeks).
- Hourly rate is $9.23 ($451.54 divided by 50 hours).
- Calculated hourly rate is $4.61 (one-half the $9.23 hourly rate).
- Ten (10) hours worked beyond forty (40) hours.
- Amount paid for overtime is $46.10.
- Overtime is paid in arrears twice monthly.

Defendant's Ex. 5, p. 4-5.

Daniels signed Centennial's Sales Compensation Plan electronically on June 25, 2008.[23] The signature page of the plan states: "I have read and understand the . . . Centennial Wireless Sales Compensation Plan. I agree to be bound by the terms, conditions, and policies contained in the Plan."[24] Defendant's Exhibit 6 is a time stamped confirmation of Daniels' electronic signature and acceptance of Centennial's Sales Compensation Plan during the course of his training.[25]

Employees are free to access or print the Sales Compensation Plan at anytime via the Company's intranet, "CentWire."[26] Daniels accessed Centennial's intranet regularly for a variety of customer related issues.[27] He used the intranet to access pricing information, as well as

---

[23] Daniels Dep., p. 78-79; Ex. 6.

[24] Defendant's Ex. 5, p. 15.

[25] Daniels Dep., 74-75, 77; Ex. 6.

[26] Filson Dep., 11.

[27] Daniels Dep., p. 70-71.

specials, promotions and credits for his own sales.[28] There were several different areas on Centennial's intranet and it is equipped with a search function.[29] However, Daniels never searched Centennial's intranet for information relating to overtime pay.[30]

Mike Loveless never told Daniels what would happen to his pay if he worked less than forty hours in a given week.[31] There was no discussion during the training session about what would happen if Daniels worked less than forty hours in a given week.[32] Aside from his own final pay check, Daniels is not aware of any situation in which he or any other Inside Sales Representative had his or her pay docked for working less than forty hours in a week.[33] In fact, Centennial paid Daniels his full salary on at least two occasions when he worked fewer than forty hours. Daniels' time cards and payroll records indicate:

- Daniels worked 39.75 hours the week of August 17 – 23, 2008 but received his full salary. (D. Ex. 7, p. 101, D. Ex. 14, p. 125.)

- Daniels worked 38.75 hours the week of December 28, 2008 – January 3, 2009, but received his full salary. (D. Ex. 7, p. 91; D. Ex. 14, p. 111.)

Moreover, Centennial paid Daniels overtime premium pay on several occasions when he actually worked less than forty hours, but logged more than forty by taking paid holiday time.

- Daniels actually worked thirty-nine hours the week of November 23–29,

---

[28] Daniels Dep., p. 71.

[29] Daniels Dep., p. 71.

[30] Daniels Dep., p. 71.

[31] Daniels Dep., p. 43.

[32] Daniels Dep., p. 59.

[33] Daniels Dep., p. 62, 102; Exs. 7 and 14.

9

    2008 and took two paid holidays totaling sixteen hours. (D. Ex. 7, p. 94.) Though he actually worked less than forty hours that week, Centennial paid him fifteen hours of overtime premium pay. (D. Ex. 14, p. 114.)

- Daniels actually worked only 32.75 hours the week of December 21–27, 2008 and took a paid holiday totaling eight hours. (D. Ex. 7, p. 92.) Nevertheless, Centennial paid him .75 hour of overtime premium pay. (D. Ex. 14, p. 112.)

- Daniels actually worked only 34.75 hours the week of January 4–10, 2009 and took a floating paid holiday totaling eight hours. Centennial paid him an additional 2.75 hours of overtime premium pay. (D. Ex. 7, p. 91, D. Ex. 14, p. 91.)

- Daniels actually worked 37.5 hours the week of February 15–21, 2009, took eight hours of paid holiday time and yet received 5.5 hours of premium pay. (D. Ex. 7, p. 88, D. Ex.14, p. 108.)

Daniels felt comfortable asking questions and raising complaints with his managers Mike Loveless and Joe Ammerman, as well as their boss, District Manager Trent Schott and company trainer Michael Filson, but he never asked any of them to further clarify Centennial's overtime pay scheme.[34]

The number of hours Daniels actually worked varied from week to week.[35] He was rarely scheduled to work more than forty hours per week but he was expected to stay past the end of his scheduled shift if he was with a customer.[36] Daniels' timecards show his hours fluctuated from week to week. The hours Daniels actually worked ranged from a low of 32.25 hours (exclusive of paid holiday and sick time) the week of November 30 – December 6, 2008 to a high of 51.75 hours the week of July 13–19, 2008.[37] The most Daniels ever worked in one week was 51.75

---

[34] Daniels Dep., pp. 31, 50, 55, 59-60, 87, 93-94, 118, 119.

[35] Daniels Dep., pp. 100-103.

[36] Daniels Dep., pp. 102-105.

[37] D. Ex. 7, p. 93 & 103.

10

hours the week of July 13–19, 2008.[38] Even that week, his hourly rate exceeded minimum wage. Daniels was earning a base salary of $18,000 annually or $346.15 per week at the time.[39] Dividing his weekly base of $346.15 by 51.75 hours equals $6.69 per hour. At the time, the minimum wage was $5.85 per hour. 29 U.S.C. § 206 (1)(A).

Daniels worked Sunday through Wednesday, February 22-25, 2009 and was terminated at the end of his shift on Wednesday, February 25, 2009.[40] This was the final day of the sales month.[41] Centennial's sales or "commission month starts on the 26th of one month and ends of the 25th of the following month."[42] Centennial paid Daniels for the 31.5 hours he actually worked, plus eight hours of holiday pay for a total of 39.5 hours his last week of employment.[43] Centennial also paid Daniels for forty-eight hours of unused vacation time.[44]

After his termination Daniels believed that he was not paid according to federal law, and thus he instituted the present action pursuant to the Fair Labor Standards Act "(FLSA)"[45]. The FLSA mandates employers pay non-exempt employees one and one-half times their regular rate

---

[38] D. Ex. 7, p. 103.

[39] D. Ex. 2; D. Ex. 14, p. 127.

[40] Daniels Dep., 141-143, Ex. 7, p. 87.

[41] Daniels Dep., 145-146; Ex. 5, p. 15.

[42] D. Ex. 5, p. 15.]

[43] D. Ex. 7, p. 87; Ex. 14, p. 107.

[44] D. Ex. 14, p. 107.

[45] In his response brief, Daniels claims that this is a "contract dispute" and discusses various theories of contract construction. However, as Centennial points out Daniels was an employee at will, and did not assert a contract-based claim in his Complaint. Accordingly, Daniels' contract construction issues will not be addressed in this order.

for hours worked in excess of a forty per week. 29 U.S.C. § 207(a). In drafting the FLSA however, Congress did not define "regular rate" or explain how an employee's "regular rate" is to be computed. 29 U.S.C. § 201 *et seq.*, <u>Condo v. Sysco Corporation</u>, 1 F.3d 599, 604, fn 6 (7th Cir 1993). Nor did Congress address the notion of fluctuating work weeks. <u>Condo</u>, 1 F.3d at 604. Instead, Congress charged the Secretary of Labor with filling in the gaps by formulating policy and making rules. Id. at 604-605, 29 U.S.C. § 204. The Secretary did exactly that in promulgating 29 U.S.C. § 778.114.

Section 778.114 of the FLSA allows an employer to pay a salaried employee whose hours of work fluctuate from week to week a fixed amount as straight-time pay for whatever hours the employee is called upon to work in a given workweek, whether few or many. 29 C.F.R. §778.114(a); <u>Condo</u>, 1 F.3d at 601-602. Section 778.114 further authorizes the employer to pay that employee fifty percent of his calculated regular hourly pay rate for that week as premium pay for each hour of work he actually performed over forty that week. <u>Id</u>. The employee's "regular" hourly pay rate is calculated each week by dividing the employee's weekly salary by the total number of hours that he actually worked that week. <u>Id</u>. As the Seventh Circuit explained, "[t]he fixed salary compensates the employee for all his hours, the overtime ones included. He therefore received 100 percent of his regular rate for each hour that he worked. As such he is entitled only to an additional fifty percent of his regular rate for the hours that he worked in excess of forty." <u>Id</u>. at 605; see also <u>Heder v. City of Two Rivers</u>, 295 F.3d 777, 779 (7th Cir. 2002) (If an employee works a "fluctuating work week" then the "standard compensation covers any number of hours, so that the only statutorily required payment is the 50% premium for overtime.").

Though § 778.114 ordinarily requires the employer to pay the full weekly salary even if the employee works less than forty hours, there are exceptions. For example, an employer is not always obligated to pay an employee his full weekly salary during his first and last weeks of employment. 29 C.F.R. § 541.602. Instead, the employer may choose to pay the salary nonexempt employee hourly at a rate that is proportional to his salary during his initial and/or terminal weeks of employment. 29 C.F.R. § 541.602(b)(6). Likewise, an employer may legally dock an employee's salary if the employee is willfully absent or tardy. Samson et al. v. Apollo Resources, Inc., 242 F.3d 629, 639 (5th Cir 2001).

This so called "fluctuating work week" structure is appropriate so long as: (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed salary that remains the same from week to week regardless of the number of hours worked; (3) the fixed salary is sufficient to provide compensation at a rate at or above the minimum hourly wage; (4) overtime premium pay for each hour worked above forty is at least one-half the employee's calculated hourly rate for that week; and (5) the parties have a clear mutual understanding that the fixed salary is intended to provide straight time compensation to the employee for how ever many hours he was called upon to work that week. Condo, 1 F.3d 601-602; Lance v. The Scotts Company, 2005 U.S. Dist. LEXIS 14949, *10-11 (N.D.Ill. 2005).

The parties agree that items (1) through (4) have been met in this case. However, Daniels disputes item (5), and claims that he did not have a clear understanding that he would be paid a full weekly rate of pay regardless of the number of hours worked.

As a preliminary issue, "pursuant to section 778.114(c) an employer must establish that a clear mutual understanding exists between the parties as to this type of pay plan. Since this

method is an exception to the normal requirements of the FLSA, the employer bears the burden of establishing that it has complied with the regulations." Local 359 Gary Firefighters, AFL-CIO-CLC v. City of Gary, Indiana, 1995 U.S. Dist. LEXIS 21729, N.D.Ind.1995.

Daniels has submitted his affidavit in which he states that: "I believed I was being paid on an hourly basis and that my pay would be reduced if I worked fewer than 40 hours in a given week."[46] Daniels relies on Evans v. Lowe's Home Centers, Inc., 2006 WL 1371073 (M.D. Pa.), for the proposition that "a sworn denial of a clear understanding by the employee was sufficient to establish a genuine issue of fact in the absence of other evidence that tends to show he did understand the plan." (Response Brief at 13). In Evans, the court held:

> Lowe's has not met its burden of proving that any of the Plaintiffs understood the Plan. Lowe's offers only that it had a policy of communicating and explaining the Plan to employees at various times including orientation, store meetings, employee promotion, and upon a change in pay. While Lowe's states that the policy included giving the employees a copy of the Plan, the company offered no evidence that this policy was executed or performed in the case of these Plaintiffs.
>
> On the other hand, the Plaintiffs to a one said that they did not understand the Plan. None were ever told about the Plan or had it explained to them, and no one was ever provided with a copy of the Plan. Plaintiffs Evans, Eidhl, Butler, and McClellan asked their supervisors about how their pay was calculated, and their supervisors could not do so. In addition, Each Plaintiff said that a work week of 48 hours was not only noted as the requirement, but it was stressed as a minimum. Each said they did not understand that they would receive overtime for hours over 40 or that they could work less than 40 hours and still receive their salary.
>
> \*   \*   \*
>
> The signed acknowledgments in the case of Plaintiffs Evans and

---

[46] Daniels Aff. at ¶ 4.

> Anselmi present a more difficult question. No court has held that a signed acknowledgment form is conclusive evidence of a clear mutual understanding as a matter of law. Moreover, even Griffin said that an executed acknowledgment form is probative of a clear understanding. Id. (citing Highlander v. K.F.C. Nat'l Mgmt Co., 805 F.2d 644, 648 (6th Cir. 1986)). Here both Evans and Anselmi submitted sworn statements that they did not understand the plan, that it was never explained to them, and that the acknowledgment form was never explained to them as setting forth any kind of a FWW or Salaried Plus Overtime Eligible Compensation Plan. Unlike the plaintiff in Highlander, Evans and Anselmi swear to their lack of understanding of the Plan, and there is no other evidence that tends to show they understood the Plan. At this stage of the case, there is a genuine issue of material fact as to whether Evans and Anselmi understood the Plan.

Id. at *11-13.

Centennial argues that Daniels has misinterpreted Evans. Centennial points out that all of the Evans Plaintiffs claimed they were never informed of the Defendant's "Salaried Plus Overtime Eligible Compensation Plan." Id., 8. Each Plaintiff stated that "Lowe's never met with employees to have the employees review the Plan, never explained it, and never provided employees with a copy of the Plan." Id., *9. Plaintiff Evans testified that though she signed an acknowledgment of the plan, she "never read the form, never received a copy of the form, nor was the plan ever explained to her." Id., *6. Evans' co-Plaintiffs, Anselmi and Berry, testified they were not given time to read the form before signing it. Id., *7. A fifth Plaintiff never signed the acknowledgment. Id., *8. All the Evans Plaintiffs claimed they did not understand how their pay was calculated. Id.

By contrast, Daniels admits he read and electronically signed off on the Centennial's Sales Compensation Plan which not only states that he "will receive his full weekly salary regardless of the number of hours worked" but goes on to provide examples and a detailed

15

explanation of how his overtime pay would be calculated.[47] While § 778.114 does not require employers to obtain signed acknowledgments, "securing such acknowledgments is certainly probative of the employee's clear understanding of the fluctuating workweek plan." Griffin v. Wake County, 142 F.3d 712, 716 (4th Cir. 1998) citing Highlander v. K.F.C. Nat'l Management Co., 805 F.2d 644, 648 (6th Cir. 1986).

Unlike the case in Evans, it is undisputed that Centennial presented its Sales Compensation Plan to Daniels electronically during his training class.[48] Also unlike Evans, it is undisputed that Centennial gives its employees as much time as is necessary to read the document and ask any questions they might have, before they must acknowledge having read and understood the plan.[49] As noted, if Daniels had not acknowledged having read and understood the plan, Centennial's commission department would not have issued him any commission checks[50] and Daniels did in fact receive commission checks from Centennial.[51]

Centennial further points out that, unlike the Plaintiffs in Evans, Daniels clearly understood Centennial's pay plan. Daniels testified that even before he was hired, he knew his starting salary would be $18,000 per year and that he would receive "halftime" pay for overtime work.[52] Daniels' offer letter, which he admits he read and signed, spells out, "You will receive a

---

[47] Daniels Dep., pp. 78-79, D. Ex. 5, p. 4-5, 15, D. Ex. 6.

[48] Filson Dep., p. 7; Daniels Dep., pp. 74-79; D. Ex. 5.

[49] Filson Dep., pp. 8-10.

[50] Filson Dep., pp. 10-11.

[51] D. Ex. 14, pp. 115, 118, 121, 124, 128.

[52] Daniels Dep., pp.19, 34-37.

salary of $692.30 per pay period, which annualizes to $18,000.[53]

Centennial urges this court to infer a clear mutual understanding from the fact that Daniels' base salary never varied despite variations in the number of hours he actually worked. Mayhew v. Wells, 125 F.3d 216, 219 (4th Cir. 1997). The existence of a "clear mutual understanding" may be "based on the implied terms of one's employment agreement if it is clear from the employee's actions that he or she understood the payment plan in spite of after-the-fact verbal contentions otherwise." Id., quoting Monahan v. County of Chesterfield, Va., 95 F.3d 1263, 1281 (4th Cir. 1996). Though his work hours fluctuated, Daniels received his base salary of $692.31 every two weeks from pay date June 20, 2008 (pay period June 1 – 14, 2008) through pay date October 24, 2008 (pay period October 5 - 18, 2008).[54] Centennial promoted Daniels to Inside Sales Representative Trainee II effective October 26, 2008 and increased his annual salary to $21,000.[55] Thereafter, although his actual hours continued to fluctuate, Daniels was paid a base salary of $807.697 every two weeks.[56]

Centennial argues that Daniels' "after-the-fact" affidavit contention that: "I believed I was being paid on an hourly basis" is directly contradicted and overridden by the fact that his weekly base pay remained constant regardless of the number of hours he worked in any given week. Mayhew, 125 F.3d at 219. Moreover, Daniels received a "regular lesson – in the form of [his] paychecks – about how the fluctuating workweek plan operates." Griffin, 142 F.3d at 716-

---

[53] Daniels Dep., pp. 33, 44; D. Ex. 2.

[54] D. Ex. 14 pp. 119, 120, 122, 123, 125-127, 129-131.

[55] D. Ex. 15.

[56] D. Ex. 14, pp. 108-114, 116-117.

17

717. Like the Plaintiffs in Monahan and Griffin, Daniels lived with the fluctuating workweek plan for a significant period of time before challenging it in Court – in Daniels' case he lived with the plan throughout his tenure with Centennial and did not sue until after he was terminated for failing to meet sales goals – "thus, it is clear from [his] actions that 'he understood the payment plan in spite of after-the fact verbal contentions otherwise." Griffin 142 F.3d at 717, quoting Monahan, 95 F.3d at 1281 n. 21.

    Centennial next argues that even though Daniels claims in his affidavit that he believed he would be docked pay if he worked less than forty hours in a given week, this claimed lack of understanding does not defeat § 778.114 classification. Centennial points out that nowhere does Daniels dispute that he understood his salary would remain the same regardless of the number of hours above forty he worked in a given week. Centennial argues that this understanding is all the regulation requires. Lance, 2005 U.S. Dist. Lexis 14949, *21, and thus Daniels' statement that he believed his pay would be docked had he worked less than forty hours in a week, is not sufficient to defeat summary judgment. As set forth above, Centennial could legally dock Daniels' pay for intentional absences. Lance, 2005 U.S. Dist. Lexis 14949, *17. Moreover, as the Fourth Circuit noted, "the regulation does not require an employer to make all employees personnel specialists. Further, we do not find that the FLSA places the burden on the employer to hold an employee's hand and specifically tell him or her precisely how the payroll system works." Id. at *25 quoting Griffin, 142 F.3d at 717 (internal quotations omitted), quoting Monahan, 95 F.3d at 1275. Nor does the law require Centennial to ensure Daniels understood how his overtime pay was calculated. Bailey v. County of Georgetown, 94 F.3d 1252, 156 (4th Cir. 1996) ("Neither the regulation nor the FLSA in any way indicates that an employee must also understand the manner

in which his or her overtime pay is calculated."); <u>Valerio v. Putnam Associates, Inc.</u>, 173 F.3d 35, 40 (1st Cir. 1999). "It is enough if, as here, the employer provided its employees with a reasonably clear and accurate explanation of their compensation,' and paid its employees according to that system of compensation." <u>Griffin</u>, 142 F.3d at 717, quoting <u>Roy v. County of Lexington</u>, 928 F. Supp. 1406, 1419, vacated in part on other grounds, 948 F. Supp. 529 (D.S.C. 1996) aff'd, 141 F.3d 533 (4th Cir. 1998).

Clearly, even accepting as true Daniels' affidavit testimony that he believed his pay would be docked if he worked less than forty hours in a week – a proposition that is directly contradicted by his own actual experiences on those occasions when he did in fact work less than forty hours a week – this testimony is not sufficient to raise genuine issues of material fact or defeat summary judgment. Accordingly, Centennial's motion for summary judgment will be granted.

## Conclusion

On the basis of the foregoing, Centennial's motion for summary judgment [DE 27] is hereby GRANTED.

Entered: May 3, 2010.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court